UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


SAUL VALDEZ,

         Plaintiff,

   v.

NATIONWIDE INSURANCE COMPANY
OF AMERICA,

         Defendant.

Case No. 3:20-CV-01196-YY

OPINION AND ORDER

YOU, Magistrate Judge.

      Plaintiff Saul Valdez brings this action against defendant Nationwide Insurance Company of America alleging a claim for breach of contract, including counts for breach of express contract terms and implied covenant of good faith and fair dealing.  First Am. Compl., ECF 21. This court has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity).  Not. Removal ¶¶ 4-7, ECF 1.

      Plaintiff has filed a motion for partial summary judgment, seeking dismissal of all of defendant's affirmative defenses.  ECF 18.  Defendant has filed a motion for summary judgment, seeking dismissal of all of plaintiff's claims.  ECF 22.  For the reasons explained below, plaintiff's motion for partial summary judgment is GRANTED IN PART as to defendant's

fourth and fifth affirmative defenses and otherwise denied, and defendant's motion for summary judgment is GRANTED IN FULL.

## I.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324 (citing FED. R. CIV. PRO. 56(e)).

In determining what facts are material, the court considers the underlying substantive law regarding the claims. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Otherwise stated, only disputes over facts that might affect the outcome of the suit preclude the entry of summary judgment. *Id*. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id*. at 248-49. A "scintilla of evidence" or "evidence that is merely colorable or not significantly probative" is insufficient to create a genuine issue of material fact. *Addisu v. Fred Meyer, Inc*., 198 F.3d 1130, 1134 (9th Cir. 2000). The court "does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev*., 180 F.3d 1047, 1054 (9th Cir. 1999). "Reasonable doubts as to the existence of material factual issue are

resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party." *Addisu*, 198 F.3d at 1134 (citation omitted).

## II.    Factual Background

This action arises out of a dispute over insurance coverage.  On May 15, 2020, plaintiff called defendant, seeking to add an insurance policy to one of his properties (referred to hereafter as "the property").  Clark Decl., Ex. A at 1, ECF 24-1.  Defendant's representative asked plaintiff a series of questions about the property to gather information and gauge eligibility.  *Id.* at 2-12. After plaintiff answered those questions, the representative informed plaintiff that he would "receive an email from [defendant] with documents" within a couple of weeks for his review and signature.  *Id.* at 2-13.

At some point over the next six days, defendant emailed plaintiff an application and insurance binder for his review and signature via DocuSign.  Plaintiff signed the application on May 21, 2020, and defendant mailed plaintiff a physical copy of the policy (sans application) on either May 21 or 22, 2020.  *See* Webb Decl., Ex. 2 at 7, ECF 20-2; Second McClain Decl. ¶¶ 4-7, ECF 33.  Around that time, and in accordance with the company's underwriting guidelines for newly-insured properties, defendant opened an independent investigation to verify the information plaintiff had provided about the property.  First McClain Decl. ¶ 5, ECF 23.  A third-party independent investigator visited the property on May 28, 2020, and provided a report to defendant, who received it on June 2, 2020.  *Id.* ¶¶ 5-6.

On May 31, 2020, a fire occurred at the property, resulting in a total loss.  *See* Webb Decl., Ex. 3 at 1, ECF 20-3.  Plaintiff reported the fire to defendant that day, and three days later, defendant's representatives obtained plaintiff's formal statement about the fire.  *Id.*; Clark Decl., Ex. L, ECF 24-12.  While investigating plaintiff's claim for coverage, defendant concurrently

continued to evaluate and assess the property's eligibility for insurance coverage.  *See* First McClain Decl. ¶¶ 8, 9, 11, ECF 23

When plaintiff did not receive any adjustments or payments from defendant, he filed this civil action in Multnomah County Circuit Court on July 10, 2020.  Compl., ECF 1-1.  Roughly a month-and-a-half later, on August 25, 2020, defendant issued a letter to plaintiff declaring that the insurance policy for the property was rescinded "back to the 05/15/2020 inception date." Webb Decl., Ex. 5 at 1, ECF 20-5.  The letter explained that plaintiff "at the time of application, misrepresented, concealed, or omitted multiple points of important (i.e., material) information" and that "[i]f truthful information had been provided, [defendant] would not have accepted the application for multiple underwriting reasons."  *Id.*; *see also id.* at 2 (listing reasons why plaintiff's policy was rescinded).  The legality of defendant's decision to rescind plaintiff's policy is central to resolving the parties' cross-motions for summary judgment.

## III.    Overview of the Parties' Motions

The parties have filed cross-motions for summary judgment, and while the respective motions significantly overlap in argumentation, they seek distinct outcomes.  Plaintiff's motion seeks summary judgment on all five of defendant's affirmative defenses: (1) policy recission, (2) breach of policy condition, (3) real party in interest, (4) lack of insurable interest, and (5) failure to state a claim.  ECF 18.  In its response to plaintiff's motion, defendant stipulated "to the dismissal of its Fourth and Fifth Affirmative Defenses."  Def. Opp. Pl. Mot. Summ. J. 3, ECF 25. Therefore, defendant concedes summary judgment on its fourth and fifth affirmative defenses.

Defendant's motion seeks summary judgment on plaintiff's claim for breach of contract, which includes two counts: breach of express contract terms and the implied covenant of good faith and fair dealing.[1]  ECF 22.

## IV.    Defendant's Motion for Summary Judgment—Plaintiff's Express Breach Claim

Plaintiff's claim for breach of contract alleges that defendant's denial of and refusal to pay plaintiff's damages constitutes an express breach of contract.  First Am. Compl. ¶¶ 1-14, ECF 21.  Defendant seeks summary judgment on this claim, arguing there is no genuine issue of material fact that it legally rescinded its insurance contract with plaintiff and it is entitled to prevail as a matter of law.  Def. Mot. Summ. J. 8-28, ECF 22.

### A.    Legal Elements

Oregon's Insurance Code requires that all fire insurance policies contain a provision regarding concealment, misrepresentations, or fraud by the insured.  The pertinent statute, O.R.S. § 742.208, provides:

> (1) Subject to subsections (2) and (3) of this section, this entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

> (2) All statements made by or on behalf of the insured, in the absence of fraud, shall be deemed representations and not warranties. No such statements that arise from an error in the application shall be used in defense of a claim under the policy unless:
> (a) The statements are contained in a written application; and
> (b) A copy of the application is indorsed upon or attached to the policy when issued.

---

[1] In its motion, defendant noted that during conferral, plaintiff "agree[d] to voluntarily dismiss his "Second Claim for Relief (Tortious Interference with Business Relationships)."  Def Mot. Summ. J. 1, ECF 22.  In fact, plaintiff has filed an amended complaint in which he does not allege that claim.  First Am. Compl., ECF 21.

(3) In order to use any representation by or on behalf of the insured in defense of a claim under the policy, the insurer must show that the representations are material and that the insurer relied on them.

O.R.S. § 742.208.[2]  The statute thus requires four distinct elements for an insurer to void a fire insurance policy based on misstatements: (1) the insured willfully concealed, misrepresented, or falsely swore any fact or circumstance concerning the insurance; (2) the statements were contained in a written application that was either indorsed upon or attached to the policy; (3) the representation was material, and (4) the insurer relied on that representation.  *Id.*

There are three other notable facets when analyzing claims under this section of the Insurance Code.  First, all reliance-related elements are interpreted in a manner consistent with common law.  *See Eslamizar v. Am. States Ins. Co*., 134 Or. App. 138, 143 (1995), *rev. den*., 322 Or. 228 (1995) ("[T]he language of the statute gives no indication that the legislature intended the term 'reliance' to mean anything other than what it ordinarily means as an element of a common law fraud claim.").  Second, the insurer bears the burden of proof for demonstrating each element of a claim of voidance.  *Mutual of Enumclaw Ins. v. McBride*, 295 Or. 398, 407 (1983) (interpreting the standard of proof for O.R.S. § 743.612, the predecessor statute for O.R.S. § 742.208).  And third, "when policy language matches the requirements of the statute," as it does in this case, the court "approaches the issue of interpretation of the policy as a matter of statutory construction." *Eslamizar*, 134 Or. App. at 142.

---

[2] As defendant notes, O.R.S § 742.013 offers guidance on how, in certain circumstances, misrepresentations and incorrect statements in an application for insurance may prevent a recovery under the policy.  However, defendant's primary argument is that the policy issued to plaintiff was voidable (and legally void), which is a legally distinct principle from an argument that recovery is barred due to misrepresentations.

**B.      Misrepresentation or Concealment Concerning the Insurance**

The first element that an insurer must demonstrate to void a fire insurance policy is that the insured either willfully concealed, misrepresented, or falsely swore any fact or circumstance concerning the insurance.  O.R.S. § 742.208(1).[3]  Defendant proffers, with evidence, at least six distinct examples where plaintiff's representations on his application differed from the true state of the property.  Def. Mot. Summ. J. 11-17, ECF 22.  Each inconsistency is described below.

First, plaintiff represented on his application that the property was not "currently undergoing extensive remodeling or additions."  Webb Decl., Ex. 2 at 4, ECF 20-2.  But just a couple of days before the fire, plaintiff held a meeting at the property with his realtor, Rosemary Crites, and architect, Adam Lawler, to "study how many affordable town homes could be built on the property."  Clark Decl., Ex. R at 9:06 – 9:11, ECF 24-18.  Crites later provided deposition testimony that the property was "being remodeled, for sure," Clark Decl., Ex. S at 2:17 – 2:21, ECF 24-19, and Lawler's photographs of the property on the date of the meeting indicate that the interior—including the walls, flooring, electrical, plumbing fixtures, etc.—was substantially incomplete.  *See* Clark Decl., Ex. T at 1-2, ECF 24-20.  Plaintiff conceded during his deposition that "the electrical [work] wasn't complete" (Clark Decl., Ex. P at 9:06 – 9:12, ECF 24-16); and there was no finished flooring (*id.* at 13:04 – 13:09); no hung sheetrock (*id.* at 13:10 – 13:20); no installed countertops or appliances (*id.* at 13:21 – 14:07); no bathroom fixtures or toilets (*id.* at 14:08-14:17); and no insulation or wood paneling in the upstairs sections (*id.* at 14:18 – 14:23).  Thus, contrary to plaintiff's representations, the property was undergoing extensive remodeling at the time he applied for insurance.

---

[3] O.R.S. § 742.208(3) separately requires that the (false) representation be material.  That element is analyzed in a separate section below.

Second, and in a similar vein, plaintiff also represented that the property was suitable for occupancy, specifically as a one-family home. Webb Decl., Ex. 2 at 4-5, ECF 20-2. But in his deposition, plaintiff's architect, Lawler, opined that he did not believe "an inspector would give a certificate of occupancy for a building in the condition it was in at that time." Clark Decl., Ex. R at 10:24 – 11:01, ECF 24-18. Indeed, Lawler refused to describe the property "as a house or a dwelling necessarily. There appeared to be no specific occupancy when I went there." *Id.* at 3:18 – 3:21. Plaintiff also conceded, during his deposition, that the property was, at the time of the fire, not suitable for occupancy by a residential tenant. Clark Decl., Ex. P at 14:24 – 15:03, ECF 24-16. Plaintiff's claim that the property was ready for occupancy was therefore untrue.

Third, plaintiff claimed on his application that there was no "business on [the] premises" of the property. Webb Decl., Ex. 2 at 4, ECF 20-2. But while providing his recorded statement about the fire to defendant's representatives, plaintiff admitted that the property was "rented to [his] company," Conexion Latina.[4] Clark Decl., Ex. L at 8, ECF 24-12. During his deposition, plaintiff suggested that his accountant had recommended this rental arrangement (i.e., plaintiff renting the property to his own company) so that he could claim the rent as an expense. Clark Decl., Ex. P at 20:21 – 21:11, ECF 24-16. And in his recorded statement, plaintiff noted that he kept an office at the property and worked there roughly "five days a week." Clark Decl., Ex. L at 9-10, ECF 24-12. Thus, by his own admission, plaintiff was running his business on the premises of the property, and his representation that there was no "business on [the] premises" was false.

---

[4] Plaintiff is a self-employed "community advocate" and owns Conexion Latina, which is a company that assists clients with immigration paperwork, taxes, and government complaints.

Fourth, plaintiff denoted on his application that the property was not subject or liable to any additional insured parties or interests. Webb Decl., Ex. 2 at 2, ECF 20-2 (spaces left blank). However, records from the Multnomah County Assessor reveal that the deed on the property was in the name of plaintiff's property management company, Renaissance Properties, LLC. Clark Decl., Ex. G at 1, ECF 24-7; *id.*, Ex. P at 22:11 – 22:19, ECF 24-16. Moreover, the LLC's interest was not only the *sole* interest on the property, but was also subject to a loan in the amount of $460,000 with interest. Clark Decl., Ex. H at 28, 54-59, ECF 24-8. Therefore, plaintiff's representations regarding the lack of additional interests and financing on the property were inaccurate.

Fifth, plaintiff claimed that there was "no prior insurance" on the property. Webb Decl., Ex. 2 at 5, ECF 20-2. But Christopher Stout, the individual who sold the property to plaintiff, testified that the property was insured for at least the first year after the sale. Clark Decl., Ex. O at 3:14 – 3:22, ECF 24-15. When questioned about this at his deposition, plaintiff conceded that the property "was previously insured on an occasion, [but the insurance company] drove by and said the property needed to be – had needed siding repair and windows – windows replaced. So they cancelled the policy." Clark Decl., Ex. P at 4:05 – 4:18, ECF 24-16. Thus, by his own admission, plaintiff's property had previously been insured, making his assertion that there was "no prior insurance" untrue.

Finally, plaintiff indicated on his application that the condition of the dwelling was "[e]xcellent." Webb Decl., Ex. 2 at 4, ECF 20-2. Yet both the third-party inspector and plaintiff's architect, Lawler, observed that the windows of the property were boarded up in late May 2020, close in time to when plaintiff submitted his application to defendant. Clark Decl., Ex. C at 1, 5, 7, ECF 24-3 (descriptions and photos showing boarded windows and broken glass);

Clark Decl., Ex. R at 7:20 – 8:03, ECF 24-18.  Both individuals also confirmed the presence of

graffiti on the property, and the third-party inspector observed that the property contained an

"attractive nuisance" of inoperable vehicles, junk appliances, farm equipment, and excessive

trash and debris.  *Id.*  In his recorded statement, plaintiff acknowledged that the property had

been painted with graffiti "a couple of months ago."  Clark Decl., Ex. L at 4, ECF 24-12.  And

during his deposition, plaintiff revealed that squatters previously inhabited the property,

requiring him to "call[] the police repeatedly" for resolution.  Clark Decl., Ex. P at 17:25 –

18:15, ECF 24-16.  These exterior conditions, combined with the undeveloped nature of the

property's interior, would not be considered "excellent" under any reasonable definition of the

term.

Plaintiff does not dispute the admissibility or accuracy of defendant's submitted evidence

surrounding his alleged misrepresentations.  He instead summarily suggests that there remains "a

genuine dispute of fact as to whether [he] willfully misrepresented any information in the

application."  Pl. Opp. Def. Mot. Summ. J. 6-7, ECF 31.

"[I]nsurance fraud or false swearing is a purely [a] civil dispute[, and accordingly], . . .

the measure of proof . . . is by a preponderance of the evidence."  *McBride*, 295 Or. at 407.

> In civil cases the word "wilful," as ordinarily used in courts of law, does not
> necessarily imply anything blamable, or any malice or wrong toward the other
> party, or perverseness or moral delinquency, but merely that the thing done or
> omitted to be done was done or omitted intentionally. It amounts to nothing more
> than this: that the person knows what he is doing, intends to do what he is doing,
> and is a free agent.

*Putnam v. Oregon Dep't of Just.*, 58 Or. App. 111, 115 (1982) (quoting *Schulstad v. Hudson Oil*

*Company, Inc.*, 55 Or. App. 323 (1981)).

In attempting to demonstrate that his actions were not willful, plaintiff cites to the

transcript of his deposition and notes that he "answered [defendant's] questions," "followed its

instructions in applying for the policy," and "trusted [defendant] to do the right thing."  Pl. Opp.

Def. Mot. Summ. J. 7, ECF 31 (citing Webb Decl., Ex. 6 at 2-8, ECF 20-6).[5]  But while plaintiff

did state these things with respect to the *agent* he was working with during his call on May 15,

2020, he says nothing about the signature he provided six days later, on May 21, 2020, when he

was prompted to review and confirm his application answers outside the presence of that agent.

That omission is telling, as the application and binder sent to plaintiff explicitly requested that he

independently "review" his provided answers and "declare that . . . all the foregoing statements,"

including statements related to the property, were true.  Clark Decl., Ex. B at 1, 8, ECF 24-2.

On balance, defendant's evidence, which demonstrates blatant misrepresentations

surrounding the condition and status of the property, along with plaintiff's silence regarding his

state of mind when reviewing and signing the application, overwhelmingly tips the scales in

favor of a finding that plaintiff made willful misrepresentations when completing his application.

While this court, on summary judgment, must view the evidence in the light most favorable to

plaintiff, considering the repeated and glaring misrepresentations here, no reasonable juror would

find that plaintiff did not make them willfully.  *See Greenstein v. Wells Fargo Bank, N.A.*, 746 F.

App'x 637, 638 (9th Cir. 2018) (cited pursuant to Ninth Circuit Rule 36-3) (upholding dismissal

of breach of contract and implied covenant claims "because there is no evidence in the record

from which a reasonable juror could find" for the plaintiff).

---

[5] Plaintiff's counsel expounded on this claim during oral argument, alleging that certain portions of the transcript of plaintiff's call when applying for insurance may suggest that defendant's representative was asking leading questions.  ECF 37.  Even assuming that is true, it remains undisputed that plaintiff still had the opportunity to independently review his answers—and was prompted to do so by defendant—before signing the application and certifying that his answers were truthful and correct.

C.    **Application Attached to the Policy**

The second requirement to void a fire insurance policy is that the fraudulent statements be "contained in a written application" and that "a copy of the application is indorsed upon or attached to the policy when issued." O.R.S. § 742.208(2). Plaintiff alleges, and defendant concedes, that a copy of the application was not attached to the final policy that was issued to plaintiff after approval. Pl. Reply Summ. J. 4, ECF 30. However, defendant argues that the signed application was attached to a temporary binder of insurance, which serves as an insurance policy when issued. D. Opp. P. Mot. Summ. J. 8-9, ECF  25. The core question is, in essence, whether a temporary binder of insurance constitutes "the policy when issued" for purposes of O.R.S. § 742.208(2).

This question, which is rooted in statutory interpretation, can be resolved by employing the three-step analysis outlined by the Oregon Supreme Court:

> The first step remains an examination of text and context. *PGE* [*v. BOLI*]*,* 317 Or. 606,] 610–11 [(1992)] . . . . But, contrary to this court's pronouncement in *PGE,* we no longer will require an ambiguity in the text of a statute as a necessary predicate to the second step—consideration of pertinent legislative history that a party may proffer. Instead, a party is free to proffer legislative history to the court, and the court will consult it after examining text and context, even if the court does not perceive an ambiguity in the statute's text, where that legislative history appears useful to the court's analysis. However, the extent of the court's consideration of that history, and the evaluative weight that the court gives it, is for the court to determine. The third, and final step, of the interpretative methodology is unchanged. If the legislature's intent remains unclear after examining text, context, and legislative history, the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty.

*State v. Gaines*, 346 Or. 160, 171–72 (2009).

Although an examination of the text and context of O.R.S. § 742.208(2) does not dispositively favor a particular side, various elements within it indicate support for defendant's interpretation. As a starting point, the plain text of the statute does not differentiate between a

temporary binder and a policy issued after the approval of an application approval (hereafter "final policy"); it simply requires that the application be attached to "the policy when issued." *Id.* The absence of such a distinction is notable for two reasons.

First, definitions within the Oregon Insurance Code, which O.R.S. § 742.208(2) is a part of, do not make the concept of a binder mutually exclusive with that of an insurance policy. The Insurance Code defines "policy" as "the written contract or written agreement for or effecting insurance, *by whatever name called*, and includes all clauses, riders, indorsements and papers which are a part thereof and annuities." O.R.S. § 731.122 (emphasis added). Put differently, the Insurance Code does not require an insurance policy to be explicitly labeled as a "policy" to be considered one; rather, it simply needs to be a written contract or agreement for effectuating insurance that contains all clauses and related material. *Id.* In fact, O.R.S. § 742.043(1), which pertains to binders specifically, refers to "[b]inders *or other contracts for temporary insurance*." (Emphasis added). And court decisions interpreting Oregon law have consistently found that binders are contracts that effectuate insurance, albeit for a limited time. *See, e.g.*, *Cooper v. St. Paul Surplus Ins. Co.*, No. CV 05-785 MO, 2006 WL 294794, at *2 (D. Or. Feb. 6, 2006) ("A binder is a temporary insurance contract in effect until the insurer issues its formal policy or rejects the application for insurance."); *Rediger v. Country Mut. Ins. Co.*, No. 6:16-CV-02263-AA, 2021 WL 2006014, at *3 (D. Or. May 19, 2021) ("A 'binder' is a temporary insurance contract that remains effective until permanent insurance is approved or disapproved.") (citing *Baylor v. Continental Cas Co.*, 190 Or App. 25, 33 (2003)) (quoting *United Pac. Ins. Co. v. Truck Ins. Exch.*, 273 Or. 283, 289–90 (1975) ("A binder ordinarily evidences a contract for temporary insurance until such time as issuance of permanent insurance is approved or disapproved or some other temporary impediment is removed.").

Second, the Insurance Code *does* contain sections that distinguish between temporary binders and final policies. Again, O.R.S. § 742.043 discusses the "temporary" nature of a binder and signals that an insurer "shall" issue a final policy "within 90 days after issue of a binder." O.R.S. § 742.043(1), (2). Plaintiff argues that O.R.S. § 742.043 "describes the relationship between a binder and a policy, drawing a distinction between the two types of agreements," which indicates that the terms "binder" and "policy" are not necessarily interchangeable within the context of the Insurance Code. P. Reply. Summ. J. 6-7, ECF 30. While the court agrees that the terms "binder" and "policy" are not synonymous within the Insurance Code, that conclusion does not prevent binders from qualifying as insurance policies. Indeed, in a similar interpretive vein, the fact that the Oregon Legislature knew how to differentiate between a binder and a final policy, yet instead chose the more general term "policy" when enacting O.R.S. § 742.208(2), suggests that it intended for the statute to apply to *all* policies within the Insurance Code.

Third, legislative history supports the notion that binders can qualify as insurance policies within the meaning of O.R.S. § 742.208. In *Ives v. INA Life Ins. Co.*, the Oregon Court of Appeals analyzed the legislative history of the statute, and wrote:

> The requirement that a misrepresentation be in writing prevents problems of proof that could arise if an insurer were permitted to deny a claim on the basis of an alleged oral misrepresentation. The requirement that a "copy" of the application be attached to the issued policy insures that the policyholder is provided with everything that the insurer relies on in issuing the policy, i.e., the entire agreement of the parties.

101 Or. App. 429, 433 (1990) (citing Oregon House legislative materials). The requirement that the application be attached to the issued policy, in essence, serves as a consumer protection mechanism, ensuring that the insured is aware of the terms of the policy when it is issued.

To be clear, the aforementioned analysis should not be interpreted to suggest that all insurance binders must be considered policies for the purpose of O.R.S. § 742.208(2). It is

possible that a binder may not contain *any* details associated with coverage, and thus not provide

the policyholder "with everything that the insurer relies on in issuing the policy." *Ives*, 101 Or.

App. at 433; *see also Brock v. State Farm Mut. Auto. Ins. Co*., 195 Or. App. 519, 531 (2004)

(declining to find that a binder existed, but noting that "it is possible for a binder to be made part

of an application for insurance"). Indeed, plaintiff suggests just that, characterizing the binder in

this case as a "two-sentence temporary binder contained within the application." Pl. Reply

Summ. J. 4, ECF 30; *see* Clark Decl., Ex. B at 8, ECF 24-2. But while the *text* of the binder

itself is indeed short, the entire document provided to plaintiff—the binder and application—

contains crucial details about the policy that was being contracted for, including a "Coverages

and Limits of Liability" section that indicated the type of policy (form Special (DP-3)),

replacement cost coverage ($514,124), "other structure" coverage ($51,520), personal liability

coverage ($500,000), medical payment coverage per person and occurrence, deductible amount,

and premium amount. *See* Clark Decl., Ex. B, ECF 24-2. Thus, plaintiff was provided with

"everything that the insurer [relied] on in issuing the policy, i.e., the entire agreement of the

parties." *Ives*, 101 Or. App. at 433. Therefore, in this case, the binder produced to plaintiff

meets the definition of a "policy" under O.R.S. § 742.208.

Plaintiff disagrees with this interpretation and raises a number of arguments in addition to

the ones previously mentioned. First, he notes that O.R.S. § 742.043, which outlines the

interactions between binders and final policies, requires that "within 90 days after issue of a

binder[,] a policy shall be issued in lieu thereof." Plaintiff seizes upon the final three words—"in

lieu thereof"—to argue that the final policy "replaces the binder in both form and function, to the

mutual exclusion of the binder." Pl. Mot. Summ. J. 9, ECF 18. Thus, according to plaintiff, the

issuance of the final policy in his case rendered the binder invalid.

However, plaintiff's argument is contrary to Oregon law.  The plaintiff in *Hansen v. W. Home Ins. Co*., made a similar argument, claiming "that [O.R.S. § 743.075(2), the predecessor statute of O.R.S. § 742.043] operates to invalidate the oral binder once a written policy is issued and delivered."  89 Or. App. 68, 72 (1987).  The Oregon Court of Appeals disagreed, holding:

> ORS 743.075(2), as amended, however, does not invalidate a binder after 90 days, but puts an affirmative obligation on the insurer to provide a policy within 90 days that conforms to the binder. It places the burden of compliance on the insurer to avoid a lapse in coverage for risks against which the insured obtained a binder.

*Id.*  In accordance with *Hansen*, the requirement that a final policy be issued "in lieu thereof" a binder simply ensures that the insured receives a final policy within 90 days of obtaining a binder, thus preventing a lapse in coverage.  In other words, the issuance of a final policy does not invalidate the existence or the validity of a binder.

Next, plaintiff argues that at least one other jurisdiction has interpreted the term "binder" to be exclusive from a "policy."  In *Springer v. Allstate Life Ins. Co. of New York*, the New York Court of Appeals[6] interpreted a two-year "contestability period" within the state's insurance code to mean that the limitations period began running only after the issuance of the final policy, "not when the risk of interim coverage first attaches."  94 N.Y.2d 645, 650-51 (2000).  The *Springer* court noted that while the state's legislature "could have chosen to measure the contestability period by the period of coverage when a carrier issues a binder and later extends coverage in a formal policy," it chose not to do so.  *Id.* (internal quotation marks omitted).

*Springer*'s holding, however, is not persuasive for two reasons.  First, as defendant notes, there exists a substantial disparity between New York law and Oregon law in how binders interact with a final policy.  Under New York law, an "insurer may modify the terms and limits

---

[6] Despite being named a court of "Appeals", the New York Court of Appeals is the final court of appeal in the state's judicial system (akin to a state's "Supreme" Court).

of coverage and premium due after the binder is issued." General Counsel Opinion 8-9-2005
(#1), 2005 WL 3980879 (NY INS BUL). This attribute may have led the *Springer* court to hold
that a binder and final policy constitute "two distinct agreements." 94 N.Y.2d at 650. Under
Oregon law, by contrast, the final policy "includ[es] within its terms the identical insurance
bound under the binder," O.R.S. § 742.043(2), and binders are "deemed to include all the usual
terms of the policy as to which the binder was given . . . , except as superseded by the clear and
express terms of the binder." O.R.S. § 742.043(1); *see Stuart v. Pittman*, 350 Or. 410, 417-20
(2011) (discussing O.R.S. § 742.043). This requirement seemingly bolsters defendant's
argument that a binder can serve as a "policy" in the context of O.R.S. § 742.043.

 Second, a wholesale application of *Springer* to the instant dispute would create an
outcome that is contrary to the statute's intended design. Adopting the *Springer* holding, which
treated a binder and final policy as two mutually exclusive items, would necessitate that a binder
could never serve as a "policy" in the context of O.R.S. § 742.208(2). Under that interpretation,
insurers would either have to refrain from issuing binders or assume the risk that a policyholder
could include a misrepresentation on the application and still claim coverage during the period
the binder was in effect. Such a consequence would go against the legislative intent behind
O.R.S. § 742.208, which is "to discourage insurance fraud." *McBride*, 295 Or. at 407 (noting
that the enactment of O.R.S. § 743.612, the predecessor to O.R.S. § 742.208, evinced "a general
public policy to discourage insurance fraud").

 In sum, the binder produced to plaintiff meets the definition of a "policy" under O.R.S. §
742.208, and because plaintiff's application was attached to that binder when it was provided to
plaintiff, the second element of the statute is met.

**D.    Representations Were Material**

The next requirement to successfully void a fire insurance policy is that the "representations are material."  O.R.S. § 742.208(3).  In the context of an application for insurance, "[i]t may be broadly stated that a false answer is material if the insurer would not have accepted the application had a truthful answer been given."  *Bunn v. Monarch Life Ins. Co*., 257 Or. 409, 412 (1970).  In certain circumstances, including this one, the determination of materiality can be made by the court.  *Mut. Life Ins. Co. of New York v. Chandler*, 120 Or. 694, 700-01 (1927) ("Some precedents have been cited where the question was one of fact . . . but where a direct question is asked by the very terms of the policy, a true answer is made material.").

Here, there is no question that plaintiff's misrepresentations on the application were material.  The declaration of Shawn McClain, a compliance specialist involved in rescinding plaintiff's policy, establishes at least six misrepresentations that, according to the insurer's underwriting guidelines, would have required defendant to either issue a completely different policy or decline coverage for the property altogether.  *See* First McClain Decl. ¶ 10, ECF 23 (guidelines prohibit coverage for properties undergoing extensive renovations); ¶ 12 (guidelines prohibit coverage for properties that are vacant); ¶ 15 (properties that were the subject of prior insurance coverage application were ineligible for coverage); ¶ 17 (limited liability companies are ineligible for dwelling and fire insurance policies); ¶ 19 (premises used for business operations are ineligible for dwelling fire insurance policies); and ¶ 14 (poor condition and history of vandalism generally leads to declination of coverage).  McClain's declaration makes clear that had plaintiff provided accurate answers about the condition of the property, defendant

"would not have accepted the application" for insurance. *Bunn,* 257 Or. at 412. Thus, plaintiff's misrepresentations on his application were material.

### E.    Reasonable Reliance on Representations

Lastly, to void a fire insurance policy, an insurer must demonstrate that it relied upon the applicant's material misrepresentations. O.R.S. § 742.208(3). An insurer can establish a prima facie case of reliance by demonstrating that (1) "it approved the policy in the ordinary course of business," (2) the false representations within the application were a but-for cause in issuing the policy, and (3) the insurer had a legal right to rely on the application information. *Crawford v. Standard Ins. Co.*, 49 Or. App. 731, 736 (1980). Once an insurer establishes a prima facie case, the burden shifts to the insured to provide "evidence that the insurer had, or was chargeable with, knowledge of facts which revealed the falsity of the representations prior to reliance." *Id.*

Here, defendant has proffered evidence sufficient to establish a prima facie case of reliance. As discussed earlier, McClain's declaration establishes at least six misrepresentations that, according to defendant's underwriting guidelines, would have required defendant to either issue a completely different policy or decline coverage for the property altogether. And as to whether defendant had a "legal right" to rely on the plaintiff's representations in his application, Oregon law does not impose any duty on an insurer "to investigate an application." *Kraus v. Prudential Ins. Co. of Am.*, 799 F.2d 502, 504 (9th Cir. 1986); *see also Kentner v. Gulf Ins. Co.*, 297 Or. 470, 476 (1986), *modified on reh'g*, 298 Or. 69 (1984) ("[T]he clear and convincing standard of proof . . . in fraud cases does not apply to proof of misrepresentation under O.R.S. § 743.612 . . . [T]he purpose of this statute is to discourage insurance fraud, and the purpose would be thwarted . . . if we were to adopt a scienter element that is more difficult to prove.").

Because defendant has established a prima facie case of reliance, the burden shifts to plaintiff to demonstrate that the "insurer had, or was chargeable with, knowledge of facts which revealed the falsity of the representations prior to reliance." *Crawford*, 49 Or. App. at 736. Plaintiff's attempt to argue such—by claiming that defendant had ample notice and sufficient time to rescind the policy but failed to do so—falls short of the mark.  Plaintiff specifically asserts that the report from defendant's third-party inspector, which was received on June 2, 2020, provided information for defendant to decline coverage.  *See* Pl. Opp. Def. Mot. Summ. J. 5-7, ECF 31 (noting the inspector's high "hazard score" and various property observations). Plaintiff also observes that defendant did not provide his attorney with the final policy until June 10, 2020, i.e., "eight days after receiving the inspection report."  *Id.* at 6.

This argument is flawed for at least two reasons.  First, there is evidence that the final policy was printed on May 21, 2020, and mailed to plaintiff either that day or the following day—over a week *before* defendant received the third-party inspector's report on June 2, 2020. *See* Second McClain Decl. ¶¶ 4-5 , ECF 33 (attesting that, according to the computer program that defendant uses, the policy was printed on May 21, 2022, and would have been mailed that day or the following day if it did not "make it to print output for mailing that day"); Williams Decl., Ex. A at 1, ECF 34-1 (screenshot of defendant's internal databases showing that the final policy was generated on May 21, 2020).  And second, even if the production of the final policy to plaintiff's attorney on June 10, 2020, constituted its issuance, defendant was still in the early stages of independently confirming the third-party inspector's observations.  *See* First McClain Decl. ¶ 8, ECF 23 (describing how the report was reviewed by the underwriting department on June 11, 2020, and an investigation was commenced), ¶ 9 (attesting that photographs were received on June 16, 2020, from Portland Fire and Rescue regarding the condition of the

property as of February 2020); ¶ 11 (explaining how defendant learning from PacifiCorp on July

2, 2020, that the electricity to the property had been disconnected for the 17 months leading to

the fire). Thus, plaintiff's argument—that defendant "had, or was chargeable with, knowledge

of the facts which revealed the falsity of the representations prior to reliance"—is not

persuasive. *Crawford*, 49 Or. App. at 736.

In sum, defendant has established the four elements required under O.R.S. § 742.208 to

effectuate a successful voidance of plaintiff's fire insurance policy. Because defendant has

successfully voided the policy, plaintiff's claim for breach of the express terms of that contract

falls. Defendant's motion for summary judgment is therefore appropriate for plaintiff's claim

alleging an express breach of the contract.

## V.    Defendant's Motion for Summary Judgment—Plaintiff's Implied Covenant Claim

Plaintiff also alleges that defendant's denial of coverage constitutes a violation of the

implied covenant of good faith and fair dealing. First Am. Compl. ¶¶ 10-14, ECF 21. In

support of this argument, plaintiff claims that defendant failed to "properly [] investigate the loss,

adjust the claim, and pay [him] for the losses sustained as a result of the fire." *Id.* ¶ 12.

This claim suffers from two clear defects. First, at a fundamental level, "[e]very contract

contains an implied covenant of good faith and fair dealing." *Stevens v. Foren*, 154 Or. App. 52,

57-58 (1998) (citing *Uptown Heights Associates v. Seafirst Corp.*, 320 Or. 638, 645 (1995)). But

if the contract is successfully voided, then there are no implied covenants for the parties to

comply with. *See, e.g.*, *Jolma v. Steinbock*, 40 Or. App. 657, 670 (1979) ("[T]he contract was

void; therefore, plaintiffs have no enforceable claim against [defendant] [in] express contract or

in [q]uantum meruit.").

Second, even if the contract remained valid, an "implied covenant cannot contradict an express contractual term, nor otherwise provide a remedy for an unpleasantly motivated act that is permitted expressly by the contract." *Zygar v. Johnson*, 169 Or. App. 638, 645 (2000).  Put differently, "a party invoking an express contractual right does not, merely by doing so, violate the duty of good faith." *Stevens*, 154 Or. App. at 59.  Here, the terms of the binder and application that plaintiff signed warned:

> Most of the information needed to issue a policy comes directly from you.
> However, on occasion, we will need additional information or need to verify
> information we have.
> . . .
> We may cancel or rescind this policy if the insured has willfully or intentionally
> made any misstatements, misrepresentations, omissions, or concealments on the
> part of the insured that are fraudulent or material to our interests."

Webb Decl., Ex. 2 at 7, ECF 20-2.  In verifying and ultimately rescinding plaintiff's policy, defendant was merely performing an express contractual right: "verifying information" provided by plaintiff and ultimately determining that the insured made misrepresentations sufficient to rescind the policy.  Because plaintiff does not allege any facts demonstrating the breach of any contractual expectation beyond the contract's express terms, his implied covenant claim fails, and defendant's motion for summary judgment must be granted as to this claim as well.

**VI.    Plaintiff's Motion: Summary Judgment on Defendant's Affirmative Defenses**

Plaintiff's motion seeks summary judgment on defendant's three remaining affirmative defenses: (1) policy recision, (2) breach of policy condition, and (3) real party in interest.  ECF 18.  The first two are easily resolvable via the analysis above: (1) defendant successfully voided its policy with plaintiff in accordance with O.R.S. § 742.208, and thus, policy recision is an acceptable affirmative defense; (2) plaintiff breached an express provision of the policy by misrepresenting material facts on his application, and thus, that affirmative defense is acceptable

as well.  Therefore, summary judgment in plaintiff's favor is improper for defendant's first two affirmative defenses.

Defendant's third affirmative defense alleges that plaintiff is not the real party in interest for insurance coverage and it instead should be plaintiff's property management company, Renaissance Properties, LLC, because the LLC holds the deed and financing to the building. Plaintiff claims that this distinction is merely semantic, as he is the sole owner and operator of Renaissance Properties.  However, having found that the policy was successfully voided as to any party, the court need not reach defendant's argument that plaintiff is not the proper party in interest.  Accordingly, plaintiff's motion for summary judgment on defendant's third affirmative defense is denied as moot.

## ORDER

Plaintiff's motion for summary judgment (ECF 18) is GRANTED IN PART as to defendant's fourth and fifth affirmative defenses and otherwise denied, and defendant's motion for summary judgment (ECF 22) is GRANTED IN FULL.

DATED  September 30, 2022.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge